UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO. 4:19-cv-00078-JHM

PHILLIP EARL EDMONDSON                                                    PLAINTIFF

V.

ANTHONY BELL, et al.                                                         DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Defendants' Motion to Strike Sham Affidavit  [DN 35] and Defendants' Motion for Summary Judgment [DN 30].  Fully briefed, this matter is ripe for decision.

## I. BACKGROUND

Plaintiff Phillip Edmonson was serving a sentence at the Union County Detention Center. [DN 30-1 at 1].  Edmonson's troubles at the jail began on July 12, 2018 when he fell from the top bunk of a bed while he was sleeping.  [DN 30-2 at 1].  He protested having to sleep on the top bunk primarily because of his bad knees and there was no ladder to get on the bed.  [DN 34 Edmonson Dep. 67:12–19].  Edmonson claimed in a post-deposition affidavit that he also told the jail that he had a prior head injury and arthritis.[1]  [DN 33-1 at 2].  When Edmonson fell from the bed, he "hit the back of his head on the inside door" of his cell.  [DN 30-2 at 1].  When jail employees assisted Edmonson, he was "alert but was not aware of where he was."  [*Id.*].  As a result, Edmonson was taken to the hospital.  [DN 30-2 at 1].  While at the hospital, Edmonson had a CAT scan and X-rays done.  [DN 34 Edmonson Dep. 68:17–19].  Edmonson's fall caused a scalp laceration and multiple contusions; he received staples for the laceration.  [DN 30-5 at 3].

---

[1] Edmonson says that he is "fully recover[ed]" from the prior head injury and that the pain from the injury "completely resolved itself" at the time of his incarceration.  [DN 33-1 at 1].

When the doctor wanted Edmonson to stay at the hospital because of his head injury, the guard who was with Edmonson responded that Edmonson could not stay. [DN 34 Edmonson Dep. 69:10–12]. He informed the doctor that the jail had a medical watch facility for Edmonson. [*Id.* at 70:3–4]. In response, the doctor wanted Edmonson watched for 48 hours at the jail. [*Id.* at 70:7–8]. When Edmonson returned to the jail, he was told that the medical watch facility was full, so he was taken to the cell block (general population). [*Id.* at 73:1–4]. Also, a medical staff member[2] saw Edmonson and said that she wanted him on a bottom bunk. [*Id.* at 73:22–74:6]. But Edmonson had to sleep on the floor. [*Id.* at 74:11–12]. On July 14, Edmonson refused to sign a "Refusal of Treatment Medical Release Form" that indicated he refused to be placed on medical watch. [*Id.* at 106:3–25; DN 30-5 at 10].

On July 16, 2018, Edmonson requested medical care for head pain, vomiting, and blood in his urine.[3] [DN 30-5 at 11]. He saw a medical professional on the same day for treatment.[4] [*Id.* at 12–13]. Edmonson was seen again on July 17, 2018 and had lab work done. [*Id.* at 14–15]. On July 19, 2018, Edmonson saw a medial professional again. [*Id.* at 16–17].[5] A nurse saw Edmonson on July 20, 2018 and Edmonson had lab work done. [*Id.* at 18–20]. Edmonson requested medical care again on July 22, 2018 to have his staples removed. [*Id.* at 21]. Medical professionals removed Edmonson's staples on July 23, 2018; they also set up a neurology appointment for Edmonson. [*Id.* at 22].

---

[2] The jail contracts with an outside healthcare provider known as Advanced Correctional Healthcare, Inc. [DN 30-4].

[3] The computer-generated date at the top of the form says July 16, 2018. [DN 30-5 at 11]. In the section completed by Edmonson, the "Date of Request" is listed as August 15, 2018. [*Id.*]. Edmonson was not able to provide a clear explanation for this but believes that he could have been confused. [DN 34 Edmonson Dep. 107:14–109:12]. Based on the sequence of events and the record, the Court believes that it is likely that July 16, 2018 is the correct date.

[4] Despite Edmonson's argument that he was not seen for his complaints about his head injury until July 20, 2018 [DN 33 at 4], Edmonson's jail medical records prove otherwise. [DN 30-5 at 8–13].

[5] The computer-generated date at the top of the form says July 19, 2018. [DN 30-5 at 17]. In the section completed by Edmonson, the "Date of Request" is written as July 20, 2018. [*Id.*]. There is also a "Medical Progress Note" dated July 19, 2018 and one dated July 20, 2018. [*Id.* at 16, 18]. Edmonson acknowledges that it is possible that he went to medical two days in a row, but he does not remember. [DN 34 Edmonson Dep. 114:21–121:8].

On July 28, 2018, Edmonson and an inmate had an altercation that resulted in him tripping, falling, and hitting his head. [DN 30-6 at 1]. Edmonson says that it "knocked [him] out," but he says he "got up" and yelled at the inmate. [DN 34 Edmonson 126:1–4]. When Edmonson was put in the "hole" after the altercation, guards tried to keep him awake. [*Id.* at 126:6–16]. Edmonson requested and received medical treatment. [DN 30-5 at 23–26]. On August 10, 2018 and August 13, 2018, Edmonson requested and received medical care. [*Id.* at 28–31]. On August 16, 2018, Edmonson requested that he be taken off his clear liquid diet that he had been on since August 14; a medical professional approved Edmonson returning to a regular diet. [DN 30-5 at 35]. A few days later, on August 24, 2018, Edmonson saw a nurse about his head pain. [*Id.* at 38]. On August 27, 2018, the jail took Edmonson to his neurology appointment, where the doctor diagnosed him with Post Traumatic Migraine, prescribed medication, and ordered a follow-up appointment. [DN 30-7 at 1]. At the beginning of September, a nurse practitioner from the jail ordered that CT scan be done on Edmonson. [DN 30-5 at 45]. Then, on September 27, 2018, Edmonson had his follow-up appointment with the neurologist. [DN 30-9].

Edmonson was involved in another physical altercation with an inmate on October 1, 2018. [DN 30-10 at 1]. He had no visible injuries based on the medical protocol the jail did on him. [*Id.*]. Edmonson requested medical treatment on October 5, 2018 and was seen on October 9, 2018. [DN 30-5 at 56, 58]. Edmonson saw a medical professional on other occasions in October 2018, November 2018, and January 2019. [*Id.* at 69–79]. He was released from jail on February 7, 2019. [DN 30-11 at 1]. After he was released, he sought medical care on March 19, 2019 at the hospital. [DN 30-12 at 1]. CT scans of his head showed no abnormalities. [*Id.*].

Edmonson later sued several defendants claiming they "knew that [he] faced a substantial risk of serious harm but disregarded that risk by failing to take reasonable measures to abate it." [DN 1 at 9 ¶ 11].  He also claims that "Defendants acted with a deliberate indifference to the medical attention required [for him] and such indifference was a direct and proximate cause or a substantial factor in causing [his] injuries . . . ."  [*Id.*].  Edmonson alleges that the actions of Defendants violated his Eighth Amendment and Fourteenth Amendment rights.  [*Id.*].  Edmonson sued several jail employees in both their individual and official capacities: Anthony Bell, Kim Wolfe, Samuel Evans, Traci McKendree, Randall Beach, Marianne Buckman, and Jeremy Elder.  [*Id.* at 1–2].  He also sued Union County.  [*Id.* at 2].  Edmonson later amended his complaint to include the addresses of certain defendants and to correct the name of Defendant Beach.  [DN 6-2].  Even though Edmonson made allegations about his medical care, he did not sue Advanced Correctional Healthcare or any of its employees that provided him with medical care.  [DN 6 at 1–2].

## II. DISCUSSION

Two motions by Defendants are currently pending before the Court: (1) Motion to Strike Sham Affidavit [DN 35] and (2) Motion for Summary Judgment [DN 30].  The Court will consider Defendants' Motion to Strike first because it has the potential to affect the summary judgment record.  Indeed, "[g]enerally, a district court should dispose of motions that affect the record on summary judgment before ruling on the parties' summary judgment motions." *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 667 (6th Cir. 2005) (citation omitted).  Thus, "[b]ecause any decision on the motion to strike could affect the evidence relevant to the motion for summary judgment, the Court considers the motion to strike first." *Smith v. Interim*

*HealthCare of Cincinnati, Inc.*, No. 1:10-CV-582, 2011 WL 6012971, at *3 (S.D. Ohio Dec. 2, 2011) (citation omitted).

### A.  Motion to Strike

#### 1.   Motion to Strike Legal Standard

Defendants request that the Court strike Edmonson's post-deposition affidavit in its entirety.  In determining whether to strike the affidavit "the Court must use 'a scalpel, not a butcher knife,' striking only those 'portions of affidavits that do not satisfy the requirements of Rule 56(c).'"  *Jacqueline Prado v. Mazeika*, No. 3:16-CV-320, 2019 WL 1301729, at *4 (S.D. Ohio Mar. 21, 2019) (quoting *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 593 (6th Cir. 2009)).  Thus, the Court will strike "only the *inadmissible* portions" of the affidavit that Defendants directly address.  *See Upshaw*, 576 F.3d at 593 (citation omitted); *see also Adkisson v. Jacobs Eng'g Grp., Inc.*, No. 3:13-CV-505, 2017 WL 10188860, at *8 (E.D. Tenn. Feb. 15, 2017) ("Specifically, the Court will only consider striking the portions of the affidavits that defendant directly addresses and criticizes.").

An affidavit cannot simply be used as a tool to avoid summary judgment.  "A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony."  *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986) (citation omitted).  When determining the "admissibility of a post-deposition affidavit at the summary judgment stage [the district court] must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony."  *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006) (citation omitted).  Sixth Circuit "precedents suggest 'a relatively narrow definition of contradiction.'"  *Reich v. City of*

*Elizabethtown*, 945 F.3d 968, 976 (6th Cir. 2019) (quoting *Briggs v. Potter*, 463 F.3d 507, 513 (6th Cir. 2006)), *cert. denied,* 141 S. Ct. 359 (2020).

"If the affidavit directly contradicts prior sworn testimony, it should be stricken 'unless the party opposing summary judgment provides a persuasive justification for the contradiction.'" *France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016) (quoting *Aerel*, 448 F.3d at 908). Otherwise, "[i]f the affidavit does not directly contradict prior sworn testimony, it should be stricken if it is 'an attempt to create a sham fact issue.'" *Id.* (quoting *Aerel,* 448 F.3d at 908–09). To determine whether an affidavit is a sham, courts consider a "nonexhaustive list of factors" such as "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain." *Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 448 (6th Cir. 2017) (quoting *Aerel*, 448 F.3d at 908–09).

### 2. Edmonson's Affidavit

*Edmonson's Affidavit Statements in Dispute.* In his response to the summary judgment motion [DN 33], Edmondson included a post-deposition affidavit [DN 33-1]. Defendants move to strike the affidavit because they argue that it is a sham. They assert that portions of it "directly contradict his deposition testimony" and "the remainder of the affidavit merely rehashes facts included in his prior testimony, including inadmissible hearsay statements." [DN 35 at 5].

The crux of the issue here is about Edmonson's deposition testimony regarding his concerns with having to sleep on a top bunk and whether he informed the jail of his pervious head injury. Defendants specifically argue that two portions of Edmondson's affidavit are contradictory, which the Court will consider because "[i]t is Defendants' obligation to

specifically identify which statements in the affidavits should be struck." *Wilson v. Budco*, 762 F. Supp. 2d 1047, 1058 (E.D. Mich. 2011) (citations omitted):

> I explained to [Anthony Bell] that I had a previous head injury and arthritis. Climbing up on the top bunk plus the height had me worried. I told him that I turn over a lot in my sleep. I was also concerned that there was no guard rail on the bunk
>
> .   .   .
>
> I have carefully read and examined the Defendants' Memorandum in their Motion for Summary Judgment and believe that it contains the following misstatement regarding my deposition.
>
> In the first half of the paragraph shown on page 2 of the Defendants' Memorandum at lines 3 and 4, the statement was made, ""and prior to this incident, his *only* concern with sleeping on the top bunk was due to problems with his knees and having no ladder," referencing pages 65–67 of my deposition. However, the deposition actually reads as follows: "Okay. So your concerns of taking the top bunk were *primarily* at that time because of your bad knees?" P.D. pg 67, lines 12–14. I then replied, "That and the ability to get up on a 5 to 6 foot high bed without a ladder or nothing there," P.D. pg 67, lines 15-16. However, because I was focused on the word primarily I forget to mention that, when I was transferred to the Union County Jail from the Webster County Jail, I advised the intake interviewer that I had a previous concussion and head injury. I also told deputy Anthony Bell that I had a previous head injury and was concerned that there were no guardrails on the upper bunks as there had been in the Webster County Jail.

[DN 33-1 at 2, 6–7].

> Defendants argue that these statements contradict the following deposition testimony:
>
> Q. Okay. So when he told you to take the top bunk, you took it, correct?
> A. Well, I discussed it with him first to no avail, and then I took it. I couldn't climb up on it because there was no ladder or nothing to get up there or guardrail or anything to hang on to. And I'm an older guy. The young guys, you know, they can take two or three run and leaps and go up on top. I couldn't do that. But there was a metal table there, so I could go over, step up on the metal table, then climb up on top of the bunk. And that's how I got down too.
>
> .   .   .
>
> Q. Prior to this, had you ever had any sleep studies done?
> A. Prior to my accident?

Q.  Yes, prior to falling off the bunk.

A.  Yes.  I had had a sleep study a long time ago, and I had sleep apnea.

Q.  Okay. Did you still have sleep apnea whenever you were incarcerated?

A.  Yes.

Q.  Okay.  At the time whenever you fell off the bunk, were you using any kind of device to help you?

A.  I had a device, but they wouldn't let me have it.

Q.  Okay.  So you weren't sleeping with a device at the time?

A.  Huh-uh (negative).

Q.  Had you previously been treated for night terrors or anything like that?

A.  No.

Q.  Okay.  In your marriage, had your wife ever told you that you were animated or combative while you were sleeping?

A.  No.

Q.  Okay.  So you don't have any prior knowledge, before this incident -- it sounds like you punched into the air, according to the guard. Do you have any knowledge of that happening ever before?

A.  No.

Q.  Okay.  Do you -- even now, do you have vivid dreams?

A.  No.

.      .      .

Q.  Okay.  So I still want to talk a little bit before you fell off the bunk.  So you didn't have any -- that you're aware of, any prior knowledge of, like, night terrors or punching into the air or --

A.  No.

Q.  I'm calling it being animated while you sleep.  I don't know if there's an actual name for it, but moving around a lot while you sleep?

A.  Do what now?

Q.  Before you fell off the bunk, you didn't have any knowledge of you moving around a lot in your sleep?

A.  No.

Q.  Okay.  So your concerns of taking the top bunk were primarily at that time because of your bad knees?

A.  That and the ability to get up on a 5- to 6-foot-high bed without a ladder or nothing there.  I mean, I'm not trying to sound smart here, but that takes a pretty good -- an old, fat man can't do it.

Q.  How tall are you?

A.  I'm 6 foot.

Q.  Okay.

A.  So I'm sitting there eye level with something that I try -- tried to pull my weight up and get -- I can't do it.

[DN 34 Edmonson Dep. at 60:4–16, 64:24–66:7, 66:23–67:25].

*Edmonson's statement that he told Bell that he turns over a lot in his sleep.*  Edmonson's statement that "I told him that I turn over a lot in my sleep" in his affidavit contradicts his deposition testimony that he did not "have any knowledge [that he] mov[ed] a lot in [his] sleep" before he fell off the bunk bed.  *Compare* [DN 33-1 at 2] *with* [DN 34 Edmonson Dep. 67:8–11]. If Edmonson had no knowledge that he moved in his sleep before he fell of the bunk bed, then it cannot also be true that he told the jail that he turns over a lot in his sleep.  *See McClain v. Mason Cty., KY*, 618 F. App'x 262, 266 (6th Cir. 2015) (plaintiff's testimony at deposition that "he did not remember filing any grievances other than those on January 25, April 8, and April 25, 2012" and that he "was too sick to file a grievance" in "mid-to-late February 2012" contradicts with his "assertion in the declaration about the alleged February 22 grievance"). Edmondson provided no persuasive justification for this contradiction.  Therefore, the portion of the affidavit concerning that he told the jail that he turned over a lot in his sleep is stricken.

*Edmonson's statement that he told the jail about his previous head injury.*  In his deposition, Edmonson stated that his primary concerns about taking a top bunk bed were his bad knees and his ability to get on the bed without anything to hang on to.  [DN 34 Edmonson Dep. 67:12–19].  In his affidavit, he adds that he "had a previous head injury . . . ."  [DN 33-1 at 2, 7]. Defendants claim that this is a contradiction because Edmondson "was questioned about every possible reason for his concerns about sleeping on the top bunk and . . . was 'primarily' concerned, due to his knees and no ladder, only after eliminating all other concerns (e.g., sleeping with a device, night terrors, moving around a lot in his sleep, punching in his sleep)." [DN 35 at 3-4].  They also claim that Edmondson's "response to the 'primarily' question . . . clearly indicates that he understood, and even attempted to clarify his answer."  [DN 39 at 2].

Edmondson's explanation in his affidavit that his concerns about the top bunk included his previous head injury does not contradict his prior deposition testimony. So, the question becomes whether Edmondson is trying to create a sham fact issue. Defendants never asked Edmondson whether his bad knees and there being no ladder were his only concerns; Defendants asked whether they were Edmonson's primary concerns. *See Aerel,* 448 F.3d at 907 (The sham affidavit rule does not prevent a party "who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit. Such an affidavit fills a gap left open by the moving party and thus provides the district court with more information, rather than less, at the crucial summary judgment stage."). Edmonson's affidavit is better understood as supplementing his deposition testimony. *See EnTech, Ltd. v. Speece*, 841 F. App'x 944, 953 (6th Cir. 2021) ("Because Bryan was not expressly asked whether the EnTech Computer was returned with its rotating hard drive, his affidavit is better understood to have 'fill[ed] a gap' in his earlier testimony by explaining that the rotating drive was not a part that 'counted,' such that his affidavit is not contradictory.").

Defendants argue that the questioning during the deposition should have elicited testimony from Edmondson about all his concerns regarding being on the top bunk. [DN 35 at 3–4]. While Defendants asked several questions regarding Edmondson's concerns, Defendants did not ask the right questions to foreclose any other concerns. *See Crawford v. Chipotle Mexican Grill, Inc.*, 773 F. App'x 822, 826 (6th Cir. 2019) ("Chipotle's questions were simply not focused enough for Chipotle to now invoke the sham affidavit doctrine."); *see also Briggs*, 463 F.3d at 513 ("While Briggs was questioned generally about that June 2001 conversation, he was not expressly asked what Pickard had said to him during that conversation. As Briggs was not under any obligation to volunteer everything Pickard said during that conversation, he should

not be prevented from providing greater detail in a later affidavit."). The Court will not strike Edmonson's statement in his affidavit that he informed the jail that he had a prior head injury.

Finally, Defendants argue that the "remainder of the affidavit merely rehashes facts included in his prior testimony, including inadmissible hearsay statements." [DN 35 at 5]. But Defendants have not identified, which statements in the affidavit are inadmissible hearsay. "[T]he Court here will only consider striking statements that Defendants both specifically identify and support with authority for striking." *Wilson v. Budco*, 762 F. Supp. 2d 1047, 1058 (E.D. Mich. 2011) (citation omitted). Because Defendants only generically refer to inadmissible hearsay statements throughout the rest of the affidavit, the Court will not strike any portion of the affidavit on the grounds of inadmissible hearsay. *See Khalfani v. Balfour Beatty Communities, LLC*, No. EP-12-CV-00422-DCG, 2014 WL 12689827, at *3 (W.D. Tex. Feb. 6, 2014) ("Plaintiff's generalized objections, however, are insufficient to warrant relief."); *see also Forbus v. Andrews Distrib. Co. of N. Texas*, No. 3:04-CV-0468-B, 2005 WL 3637041, at *3 (N.D. Tex. Nov. 1, 2005) ("The Court is not required to comb through each affidavit and isolate what it believes Forbus is objecting to.").

## B. Motion for Summary Judgment

Defendants argue that Edmondson has waived certain claims and that summary judgment is appropriate for his individual capacity claims against Defendants. [DN 37 at 2–8]. The Court will address each argument in turn.

### 1. Legal Standard

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the initial burden of specifying the

basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

### 2. Edmonson's Waiver of Certain Claims

Defendants argue that Edmonson has waived his claims regarding municipal liability, his claims against Defendant Elder, his Fourteenth Amendment claim, and certain Eighth Amendment claims. "When a plaintiff 'fails to address [a claim] in response to a motion for summary judgment,' the claim is deemed waived." *Alexander v. Carter for Byrd*, 733 F. App'x 256, 261 (6th Cir. 2018) (quoting *Haddad v. Sec'y, U.S. Dept. of Homeland Sec.*, 610 F. App'x 567, 568–69 (6th Cir. 2015)). When a claim is waived on that basis, district courts in the Sixth Circuit "grant summary judgment as a matter of course." *Id.*

*Waiver of Municipal Liability Claim and Claims Against Defendant Elder.* Edmonson sues the jail employees in their official capacities. "Official-capacity suits . . . 'generally represent [ ] another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 n.55 (1978)). Therefore, Edmonson's official-capacity claims against Defendants Anthony Bell, Kim Wolfe, Samuel Evans, Traci McKendree, Randall Beach, Marianne Buckman, and Jeremy Elder are claims against Union County. The question becomes whether Union County can be held liable.

Edmondson did not respond to Defendants arguments regarding Union County's liability, so his *Monell* claim against Union County is waived. Accordingly, summary judgment for

12

Union County is granted.   Edmonson also alleged that Jailer Jeremey Elder was liable as a supervisor because he "failed to adequately supervise, control, and train" employees  [DN 6 at 11 ¶ 4], but he did not respond to Defendants arguments regarding this claim.   [DN 37 at 8].   He also did not respond to Defendants arguments regarding Elder being sued in his individual capacity.  [*Id.* at 7–8].   Summary judgment is granted in favor of Elder.

*Waiver of Fourteenth Amendment Claim.*   Edmonson's complaint alleges Eighth and Fourteenth Amendment violations.   [DN 6 at 10 ¶ 11].   Defendants argue that because Edmondson "was a convicted prisoner . . . his Fourteenth Amendment claim must be dismissed." [DN 31 at 5] [footnote omitted].   They also assert that since Edmonson has not responded to their argument regarding dismissal of his Fourteenth Amendment claim, Edmonson has waived that claim.   [DN 37 at 2–3].

Because Edmonson was not a pretrial detainee [DN 34 Edmonson Dep. 47:16–19], his Fourteenth Amendment claim fails.  *See Lawson v. Hedgespeth*, No. 1:17-CV-00061, 2019 WL 2997392, at *4 (W.D. Ky. July 9, 2019) ("Therefore, the Due Process Clause of the Fourteenth Amendment would apply to Plaintiffs' cruel and unusual punishment claims if they were pretrial detainees.").   Additionally, since Edmonson did not respond to Defendants' argument regarding dismissal of his Fourteenth Amendment claim, he has waived his Fourteenth Amendment claim. [*See* DN 33 at 2, 4, 5] [discussing only his Eighth Amendment claim].   Thus, the Court grants summary judgment on Edmondson's Fourteenth Amendment claim.

*Waiver of Eighth Amendment Claims Regarding Housing Assignment and Sleeping Conditions.*   Edmonson makes Eighth Amendment claims regarding his medical care, having to sleep on a top bunk, and his housing.  [DN 6 at 6–9 ¶¶ 1–10, DN 34 Edmonson Dep. 173:9–12, 174:21–175:11, 177:4–9].   Defendants argue that Edmonson's complaints about where he had to

sleep, who he was housed with, and being placed in solitary confinement does not rise to the level of a constitutional violation.  [DN 31 at 6–8].   Edmonson failed to respond to all of Defendants' arguments about his Eighth Amendment claims except for his Eighth Amendment denial-of-medical-care claim.  [DN 37 at 3].  His response focuses solely his Eighth Amendment denial-of-medical-care claim.  [DN 33 at 4].  Therefore, summary judgment is granted on all of his Eighth Amendment claims, except his Eighth Amendment denial-of-medical-care claim.

### 3.  Individual-Capacity Claims: Eighth Amendment Denial-of-Medical-Care Claims

"Section 1983 provides a federal cause of action against government officials who, while acting under color of state law, 'deprived the claimant of rights, privileges or immunities secured by the Constitution or laws of the United States.'"  *Rhinehart v. Scutt*, 894 F.3d 721, 735 (6th Cir. 2018) (citation omitted).

An incarcerated individual's Eighth Amendment right to adequate medical treatment is violated when a prison official acts with "deliberate indifference to serious medical needs of prisoners . . . ."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  "To establish a prison official's deliberate indifference to a serious medical need, an inmate must show two components, one objective and the other subjective."  *Rhinehart*, 894 F.3d at 737 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).[6]

Neither Defendants nor Edmonson appear to dispute that Edmonson has met the objective component of his Eighth Amendment claim.  Indeed, Defendants assert that "there is no dispute

---

[6] As the Court later explains, Edmonson cannot show that the individual defendants violated his constitutional rights.  Since summary judgment is appropriate on that basis, the Court need not consider whether the individual defendants are entitled to qualified immunity.  *See Peterson v. Clanton*, No. 16-CV-10353, 2017 WL 3392901, at *2 n.3 (E.D. Mich. Apr. 24, 2017), *report and recommendation adopted,* No. 16-CV-10353, 2017 WL 3386387 (E.D. Mich. Aug. 7, 2017) ("Defendants also argue that they are entitled to qualified immunity. However, because the Court is recommending that their summary judgment motion be granted for the reasons discussed below, the Court need not consider the qualified immunity issue.").

that Plaintiff was provided medical care" [DN 31 at 10] and "[t]here can be no dispute as to the 'obviousness' of Plaintiff's injuries because there is no dispute that Defendants took Plaintiff to the hospital after he fell from the bunk" [DN 37 at 4]. So, assuming, without deciding, that the objective component is met, the Court proceeds to the subjective component.

The subjective component requires that the plaintiff show that the official acted with "a sufficiently culpable state of mind"—that is, one in which "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 834, 837 (citations omitted).

In his response to the summary judgment motion, Edmonson argues exclusively that he was denied or delayed medical care. [*See* DN 33 at 4, 9]. The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) (citations omitted). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.* (citations omitted). Here, Edmonson individually sues only non-medical jail employees. So, "[i]f a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Smith v. Cty. of Lenawee*, 505 F. App'x 526, 532 (6th Cir. 2012) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). Indeed, "[a]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a

15

non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.* (quoting *Spruill,* 372 F.3d at 236).

"This subjective component must be addressed for each officer individually." *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005). Accordingly, the Court considers each defendant in turn.

*Defendant Randy Beach.* Edmonson claims that on July 12, 2018, his "head began to bleed and he had developed blood in his urine." [DN 33 at 3 ¶ 6]. He says that when he requested medical attention, Beach ignored his request. [*Id.*]; [DN 34 Edmonson Dep. 192:18–24]. Edmonson received medical care when he returned from the hospital on July 12. [DN 34 Edmonson Dep. 73:22–74:3; DN 30-5 at 8]. Then, on July 16, 2018, Edmonson requested medical care regarding head pain, vomiting, and blood in his urine. [*Id.* at 11]. Edmonson recieved treatment the same day. [*Id.* at 12–13]. Edmonson received some medical attention and he has not given the Court a reason "to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) (citations omitted). No reasonable jury would determine that Beach acted with a sufficiently culpable state of mind that violates the Eighth Amendment. Summary judgment is granted for Beach.

*Defendant Sam Evans*. Edmonson asserts that on July 13, 2018 he "was in excruciating pain and continued to have blood in his urine and the bleeding from his wound was increasing." [DN 33 at 3 ¶ 7]. He claims that Evans "denied him the requested medical attention." [*Id.*]. A medical professional saw Edmonson on July 13, 2018. [DN 30-5 at 8]. On July 14, 2018, another medical professional determined that Edmonson's vitals were fine. [*Id.* at 9]. In his jail

medical records, there is a form from July 14, 2018 that indicates that Edmonson refused to be put on medical watch and he refused to sign the form.  [*Id.* at 10].

A couple of days after complaining about blood in his urine, Edmonson says that he later called his business attorney.  [DN 34 Edmonson Dep. 100:3–5].  His attorney contacted the jail and requested medical attention for him.  [DN 33 at 3 ¶ 8].  In response to the call, Edmonson claims that he "was cursed [at] by Defendant Lt. Sam Evans who ordered another guard, Defendant Anthony Bell, to throw him in the 'hole.'"  [*Id.*].  After Bell attempted to take Edmonson to the "hole," "Evans dropped the Plaintiff back on the floor and then threatened to pepper spray him."  [*Id.*].  Edmonson says that he was, again, not given medical attention.  [*Id.*].  Edmonson requested medical care on July 16, 2018 and received care regarding his complaint on July 16 and July 17.  [DN 30-5 at 11–15].

The way that Evans spoke to Edmonson does not rise to the level of an Eighth Amendment violation because "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment."  *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987).  Regarding his medical care, Edmonson received some medical attention and he has not given the Court a reason "to second guess medical judgments . . . ."  *Westlake*, 537 F.2d at 860 n.5 (citations omitted).  Edmonson also has not pointed to any evidence that shows that Evans drew an inference that a substantial risk of serious harm existed.  Thus, the Court grants summary judgment in favor of Defendant Evans.

*Defendant Anthony Bell.*  Anthony Bell is the guard that told Edmonson that he had to sleep on the top bunk.  [DN 34 Edmonson Dep. 55:14–16].  According to his affidavit, Edmonson informed him that he had a prior head injury and arthritis.  [DN 33-1 at 2].  As the

17

Court previously explained, Edmonson waived his arguments about Eighth Amendment violations from having to sleep on the top bunk. Contrary to Edmonson's complaint that he received no medical attention after Bell ordered Edmonson to be put in the "hole" and Evans dropped Edmonson, he received medical care after that incident as the Court previously explained. Edmonson complains that Bell cursed at him [DN 33 at 3], which the Court has also previously explained does not amount to a constitutional violation. At his deposition, Edmonson said that he recalls one occasion that Bell did not provide a medical request form when he asked for it, but Edmonson provides no details about that occasion. [DN 34 Edmonson Dep. 52:6–19]. Nor does Edmonson show that failure to provide one medical request form amounts to an Eighth Amendment violation. Edmonson has not pointed to evidence that would show that Bell acted with a state of mind sufficient to prove a violation of the Eighth Amendment. The Court grants summary judgment in favor of Defendant Bell.

*Defendant Kim Wolfe*. Edmonson claims that he called his divorce attorney to ask that he call the jail and request medical attention for him. [DN 33 at 3 ¶ 9]. He says that Wolfe "responded by punishing [him] for calling his attorneys by putting him in the 'hole' for 16 hours and attempting to get him to sign a form stating that he was refusing medical treatment which he refused to sign." [*Id.*]. This occurred on July 14 after Edmonson fell from the top bunk. [DN 34 Edmonson Dep. 101:12–24]. On that day Edmonson refused to sign a form that indicated that he refused to be placed on medical watch. [DN 30-5 at 10]. Edmonson argues that Wolfe's actions was another denial of medical care. [DN 33 at 3 ¶ 9]. On July 14, 2018, a medical professional said that Edmonson's vitals were fine. [DN 30-5 at 9]. The Court is not going "to second guess medical judgments . . . ." *Westlake*, 537 F.2d at 860 n.5 (citations omitted). Edmonson does not

point to any action by Wolfe that indicates that she acted with deliberate indifference to his need for medical care.  Defendant Wolfe is entitled to summary judgment.

*Defendant Traci McKendree*.  After the July 28, 2018, altercation between Edmonson and an inmate when he tripped and fell backwards, Edmonson asserts that McKendree said, "We're not taking you to the hospital again so don't even try to doze off on us." [DN 33 at 4 ¶ 10].  While Edmonson was in the "hole," guards tried to keep him awake.  [DN 24 Edmonson Dep. 126:10–11].  According to Edmonson, McKendree ordered that he be kept awake.  [*Id.* at 126:14–16].  Edmonson says that he "received no immediate medical attention and as punishment was put in the 'drunk tank' for 2 ½ months." [DN 33 at 4 ¶ 10].  After another physical altercation with an inmate on October 1, 2018, Edmonson says that McKendree "put him in the 'hole' and told him, 'Don't try to go to the hospital because we aren't taking you[.]'" [*Id.* at 5 at ¶ 11].

Although Edmonson complains that he did not receive immediate medical attention regarding the July 28 altercation, he received medical attention on the same day according to the jail medical records.  [DN 30-5 at 24].  Edmonson was also put in a cell "for medical observation."  [DN 30-6 at 1].  His jail medical records also show that he received medical treatment the day of the October 1, 2018 incident.  [DN 30-5 at 55].  After that incident, a medical protocol was done on Edmonson and "there was no visible injuries." [DN 30-10 at 1]. In fact, his doctor at Deaconess Clinic said the following in May 2020:

> I was bluntly honest and explained to the patient that I would have no means of helping him establish any **definite with reasonable medical certainty answer** about whether the timing of medical evaluation made a difference in his ultimate outcome and present day symptoms? Specifically, would he be any better off present day if he would have been immediately taken for immediate medical are after his 2nd and 3rd concussion type injuries outlined above when he had altercations with other inmates when he was Incarcerated?

> What I can say is the fact that his MRI brain scan that was performed after the above concussion injuries with a negative result would imply that nothing bad was ongoing that would have warranted attention sooner.

[DN 30-18 at 10].

To the extent Edmonson is complaining about the adequacy of his medical treatment following the altercations, he has not given the Court a reason "to second guess medical judgments . . . ." *Westlake*, 537 F.2d at 860 n.5 (citations omitted). To extent Edmonson is complaining about a delay in medical treatment, "[a]n inmate may satisfy the subjective component of the Section 1983 standard by showing that prison officials' delay in providing medical treatment caused unnecessary pain or the worsening of his condition." *Broder v. Corr. Med. Servs., Inc.*, No. 03-75106, 2008 WL 704296, at *2 (E.D. Mich. Mar. 14, 2008) (citing *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837). Edmonson has not shown that if there was a delay in his medical care, the delay caused any unnecessary pain or worsening of his condition. Additionally, there is no evidence that demonstrates that McKendree was aware of any substantial risk of serious harm to Edmonson if he was not given medical treatment immediately. The Court grants summary judgment in favor of Defendant McKendree.

*Defendant Marianne Buckman.* Edmonson makes no specific mention of Buckman in his response. However, he testified that Buckman told him that "if [he] wanted a bottom bunk, [he would] have to buy one from another inmate." [DN 34 Edmonson Dep. 193:17–18]. This is the only time he ever spoke to Buckman during his incarceration. [*Id.* at 193:20–21]. No reasonable jury would determine that Edmonson has shown that Buckman acted with "a sufficiently culpable state of mind" in violation of his Eighth Amendment right to medical care. The Court grants summary judgment in favor of Buckman.

20

### III. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendants' Motion to Strike Sham Affidavit is **GRANTED IN PART AND DENIED IN PART** and Defendants' Motion for Summary Judgment is **GRANTED**.

Joseph H. McKinley Jr., Senior Judge
United States District Court

May 24, 2021

cc:     counsel of record